## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **EASTMAN KODAK COMPANY,** | : | **Civil Action Number** |
|  | : | **02-CV-6564 T-F** |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| **AGFA-GEVAERT N.V. and AGFA CORP.,** | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

## REPORT AND RECOMMENDATION
## OF THE SPECIAL MASTER
## NUMBER 3
## REGARDING:  VARIOUS DISCOVERY ISSUES

**TO THE HONORABLR JONATHAN W. FELDMAN:**

This Court's Order of June 13, 2005 (Docket Number 151), appointed me as special master pursuant to Rule 53(b), Federal Rules of Civil Procedure.   The Court referred certain issues to me that were raised in discovery motions filed by the parties, specifically Docket Numbers 80, 95 and 99.   This report and recommendation will address the remaining issues in Kodak's Motion to Compel (Docket Number 99).

The Court originally referred Points I, II, III and IV of Kodak's Motion to Compel to me for report and recommendation.   However, the parties were able to resolve some of their issues without my assistance.   Additionally, the parties participated in two in-person conferences in my offices.   During these conferences many issues were resolved.   Both parties were extremely cooperative and professional and approached the conferences with

very positive attitudes.  However, some of the issues could not be resolved.  I submit the following report and recommendation on these issues.

This report is based upon a review of an abundance of material submitted to me by the parties.  I have reviewed the memoranda and supporting materials submitted to the Court, as well as supplemental letter briefing that the parties provided to me.  Also, the parties participated in at least one substantive teleconference and two in-person conferences in my offices (which were transcribed by a court-reporter).  Both parties are directed to file with the Court any materials submitted to me that were not previously filed with the Court.  These filings should include complete copies of the letter briefs prepared at my request and the transcripts[1] from the two conferences held in my offices.

## I.     INTRODUCTION

Kodak's motion to compel raises a host of discovery issues.  As stated above, many of the original issues have been resolved.  However, there remain a number of issues that will be discussed below.

For the Court's reference, attached as Exhibit A, is a table prepared by the parties.  This table summarizes the remaining issues and indicates which issues are moot and which are still outstanding.  At the bottom of the pages of Exhibit A are page numbers that the parties and I referred to when discussing the issues.  I will continue to adhere to this standard.  So, for example, when I am referring to "Issue 2", I am referring to the

---

[1] Citations to the transcript of these in-person conferences conducted on September 9, 2005 and September 20, 2005, will be referred to simply as "Tr."

issue on page 2 of Exhibit A, which in this case is "Kodak's Document Request 112."[2] Some additions to Exhibit A have occurred subsequent to the preparation of the exhibit. For example, as to some outstanding issues, Kodak may not be satisfied with Agfa's efforts in providing additional information.   In any case, these additional issues are spelled out in correspondence to me from the parties dated February 7, 10, and 14, 2006. These additional issues will be addressed herein.


II.      **DISCUSSION**

It is my understanding that I do not need to take any further action regarding Issues 1, 3, 4, 7, 8, 10, 11, 13, 17, 18, 19, and 20. The remaining issues are addressed below in numerical order.

A.      **Issue Number 2 – Kodak Document Request 112**

In Kodak Document Request 112, Kodak requests that Agfa provide documents relating to grain sizing data for any accused products.  As part of this request, Kodak is asking for Excel files with all sorting functions in-tact.  Agfa has produced electronic copies of the Excel files but, for documents created after commencement of this litigation, Agfa has removed certain portions of these electronic files (the sorting functions) because it contends that any of this type of material created after the litigation was expressly created at the direction of counsel for use in the litigation.

The privilege issues in this case are interesting in that some understanding of the technical aspects of the case claims is required.  Kodak's counsel explained a portion of this issue as follows:

---

[2] This report and recommendation does not address Issues 25, 26 and 27.  These issues have been addressed in another report and recommendation.

> Kodak has stringently adhered to the line drawn by both parties in the
> testing area: both parties have produced the actual grain measurements and
> have withheld analyses of those measurements (including the "sortings"
> described in my July 8,2005 letter to you) on privilege and/or work
> product grounds.

Letter from Rochford to Sigmond of 7/20/05 at 2.  Thus, Kodak and Agfa have agreed

that any raw data is discoverable.  Further, the parties have agreed that, at least for any

calculations performed after commencement of this litigation, the analyses of the raw

data (sortings or calculations, etc.) are privileged.  Tr. at 75.

While both parties seem to agree that pre-litigation sorting functions should be

produced, they disagree over whether sorting functions from after the commencement of

this litigation should be produced.  Kodak's position is that Agfa should produce such

functions.  Agfa argues that they should not be produced because any post-litigation

sorting was done at the direction of litigation counsel.  Currently, Agfa has provided

post-litigation files including raw data, but with the sorting function and results removed.

In essence, Agfa produced Excel spreadsheets with these formulas removed.  Again,

Agfa's position is that this would be privileged/work product:

> MR. BURGAN:  No, no.  What we are saying is everything that was done
> after the lawsuit began was at our direction.  It was done however we
> wanted it done.

Tr. at 59.

This issue was discussed during one of the conferences at my offices.  Tr. 41-72.

Agfa explained its position regarding privilege and work product.  At the conference, I

was inclined to agree with Agfa.  My position is unchanged.  It would be a difficult task

for Agfa to separate the privileged information from the non-privileged in these Excel

files.   The information Agfa removed was a reasonable attempt to provide the

information Kodak requested while at the same time protecting its privileged material:

> MR. BURGAN:  They gave us a spreadsheet that had been modified so
> that there was no way to know what the sorting function was.  We have
> given them that sorting function for everything that was measured prior to
> the filing of the lawsuit.  They have the sorting function.  They just don't
> want to take the data from one spreadsheet and put it in another one and
> sort it, however, that program sorts it.
>
> MR. SIGMOND:  This is maybe my -- if it's the same sorting function,
> why not give it to them for the later --
>
> MR. BURGAN:  Because what's in there also are things that were picked
> to run the tests before we did it --
>
> MR. ORMAN:  And we don't want that.
>
> MR. BURGAN:  -- for us.
> But the problem is then I have to go through all these spreadsheets, look
> for every little square that might have a parameter that was picked after
> the lawsuit, and then I've got to start to delete.  Once I start to delete,
> they're going to lose all the functionality.  Because it's not just a sample of
> put in a zero and everything changes.  It still has different items that were
> picked scattered throughout two different pages in the spreadsheet.

Tr. at 51-52.  In the end, Kodak received the raw data.  With this data, Kodak can do

whatever further analysis it wants.  I recommend that Agfa not be compelled to produce

further electronic files relating to the sorting functions.

Finally, Agfa reports that it has produced the micron values for thickness, ECD

and projected area to the extent that information already existed.   Agfa objects to

creating new electronic files for production to Agfa.  I find Agfa's position reasonable.

Agfa should not have to create new data that is not kept in the ordinary course of

business.

**B.      Issue Numbers 5, 6 and 23 – Acceptable Non-Infringing Substitutes**

At issue with respect to Kodak's Interrogatory 8, Document Requests 26 and 46, and request for a 30(b)(6) witness on acceptable non-infringing substitutes, is the level of specificity required of Agfa in identifying acceptable non-infringing substitutes.   To identify products they believe to be acceptable non-infringing substitutes, Agfa provided two charts grouping products by film type and by the type of application for which a film is suitable.  Letter from Rochford to Sigmond of 2/7/2006 at Tab D.  Kodak argues that Agfa must produce exact pricing information for substitute products, as well as detailed information about when the products were available and the periods for which Agfa considers the products to be substitutes.  *Id.* at 2.  Agfa counters that they provided a deposition of Ray Russell, a marketing employee from Agfa, to assist Kodak in interpreting the chart, and that requiring further specificity prior to claim construction is unreasonable.  Letter from Burgan to Sigmond of 2/10/2006 at 2.

I find Agfa's arguments persuasive.  At this point in the litigation, Agfa should not be required to identify "non-infringing" substitutes with greater specificity than it already has.  The charts provided by Agfa identify, in each row, products that they believe are acceptable substitutes for the other products in the row.  Review of the Russell deposition reveals that the witness explained how Agfa created the chart by considering commercially reasonable substitutes.  Requiring Agfa to take a more specific position than identifying products they believe to be commercially reasonable substitutes is unreasonable without the benefit of claim construction.  In addition, it is assumed that Agfa's expert(s) will provide a more detailed description.  For now, I find Agfa's discovery responses sufficient.

**C.    Issue Number 9 – Kodak Interrogatory 4**

Kodak's Interrogatory 4 seeks all bases for Agfa's claims that the patents in suit are invalid.  Agfa supplemented their response by providing a list of prior art for each of Kodak's patents for which they could assert invalidity.  Kodak argues that Agfa's supplement is inadequate because Agfa fails to provide the specific combinations of prior art they intend to use.  Tr. at 120-121.  Agfa counters that they cannot be more specific, especially prior to the *Markman* hearing, and therefore their response is satisfactory.  Tr. at 124, 129-130.

As of now, providing a list of patents, even as many as eight, to invalidate a single patent, is sufficient to show a reasonable basis for Agfa's invalidity defense.  As with the previous issue, Kodak may get more detail from Agfa's expert after Agfa has the benefit of a claim construction.  For now, Agfa has provided adequate responses.

**D.    Issue Number 12 – Kodak Interrogatory 21 and Document Requests 25 and 45**

Kodak Interrogatory 21 and Document Requests 25 and 45 seek the description and production of all documents relating to (i) Agfa's communications with current or former Kodak employees that have occurred since the litigation commenced and that have concerned the litigation or the patents in suit, and (ii) all payments of money, or transfers of other value to such persons by Agfa.  Agfa represents, and Kodak does not contest, that Agfa has provided all information regarding communications with former

Kodak employees other than Harry Roberts. Tr. at 182. Thus, communications with Mr. Roberts are the only remaining issue.

Agfa admits that Mr. Roberts is serving in a "dual capacity as a fact witness and a non-testifying expert for Agfa." Letter from Burgan to Sigmond of 9/28/2005 at 1.[3] Agfa contends that a person can act as a fact witness and a non-testifying expert and that payment for their services does not taint their factual testimony. *Id.* Agfa also argues that because attorney communications with a non-testifying expert or consultant are not discoverable, all Kodak's requests for descriptions of, and documents relating to, their communications with Mr. Roberts, should be denied. *Id.* at 2.

However, Agfa has not presented an argument as to why Mr. Roberts's communications as a fact witness are protected. Therefore, the issue becomes, at each point in time, whether or not Mr. Roberts acted as a fact witness or a non-testifying expert. Agfa should produce documents relating to any communications with Mr. Roberts in his role purely as a fact witness. The communications with Mr. Roberts can be subdivided into three categories: (1) payments and communications before Mr. Roberts' deposition on June 3-6, 2003, (2) communications during breaks in the deposition; and (3) payments and communications after the deposition. These will be addressed in order.

### 1. Before the Deposition

Agfa stated that as soon as they became aware that Mr. Roberts had factual information relevant to the case, they gave notice to Kodak and produced Mr. Roberts for

---

[3] Subsequent to the letter, Kodak moved to disqualify Mr. Roberts from providing expert services to Agfa. This resulted in a Stipulation and Order (Docket Number 180) in which Agfa agreed to discontinue the consulting relationship with Mr. Roberts.

a deposition.   Since Kodak had the opportunity to pose questions regarding pre-deposition communications, Agfa should not be required to produce further factual information (gained from pre-deposition communications) about which Kodak did not inquire.   At the conference, Agfa indicated they had provided pre-deposition correspondence with Mr. Roberts.  Tr. at 172.  Thus, Agfa has complied with this request in regards to pre-deposition communications with Mr. Roberts.

As far as payments to Mr. Roberts, it appears that the door to this has already been opened.  It has already been disclosed that Mr. Roberts received about $8,000 prior to his deposition.  Tr. at 162.  Therefore, Agfa should produce information relating to that payment.  Agfa should not have to produce any further information relating to any other payments to Mr. Roberts for the times he was acting as a consultant.

## 2. During Breaks in the Deposition

It is clear that Mr. Roberts was acting as a fact witness during his deposition. Allowing Mr. Roberts to switch roles mid-deposition would create such a granular standard that ascertaining the role of a dual witness would be virtually impossible. Furthermore, Mr. Roberts was not being represented by Agfa at the deposition.  Thus, all communications with Mr. Roberts during the breaks in his deposition are discoverable. Agfa should produce a summary of any factual information discussed with Mr. Roberts during the breaks in his deposition.

## 3. After the Deposition

No evidence has been produced by Kodak to show that Mr. Roberts acted as a fact witness after the deposition.   If such communications occurred then these communications may be discoverable.  However, so long as Mr. Roberts acted as a non-

testifying expert in post-deposition communications, his communications should be protected.

With regard to any payments made to Mr. Roberts, Agfa should produce descriptions of and documents relating to any payments to Mr. Roberts that relate solely to his role as a fact witness.  For example, any payments compensating Mr. Roberts for the deposition itself, whether made before, during, or after the deposition, should be disclosed.

### E.    Issue Number 14 – Kodak Interrogatories 29 and 34

Kodak Interrogatories 29 and 34 seek a description of all methods and procedures used to measure grains, identification of all persons who made such measurements, and identification of all documents concerning the measurement methods and procedures.  In particular, the parties disagree as to whether Agfa provided a sufficient response for production testing at DuPont and Sterling.  Tr. at 277-278.  Agfa has pointed to a volume of laboratory notebooks, written in English, which they argue show that production tests were performed by DuPont.  Tr. at 278-280.  Kodak counters that Agfa should produce descriptions of the notebooks because they are unable to determine if the notebooks contain production tests (e.g., production emulsions) or if, on the other hand, the notebooks contain research emulsions, which do not provide an answer to their interrogatory.  Tr. at 285.

In response to these interrogatories Agfa asserts that the produced laboratory notebooks contain data illustrating production tests performed by DuPont.  Tr. at 280.  Agfa contends that Kodak has the same ability as Agfa to derive the answer from the documents produced.  However, Agfa has indicated they are unsure whether or not the

boxes they produced actually contain documents showing that pre-litigation production

testing was performed by DuPont, as the following illustrates:

> MR. BURGAN: They're asking, what were the procedures that were used
> to measure grain size. I don't know what the procedures were at DuPont.
> I haven't found any . . . I haven't seen anything in any of the, what was it,
> 20 or 30 boxes, 10 boxes I think you had produced, that I didn't see
> anything in any of that that there were any procedures or how to measure
> grains.

> MR. ORMAN: I guess again, if that's the answer that there's nothing else,
> that's the answer.

> SPECIAL MASTER SIGMOND: But again, I think Jeff is saying that it
> might be in a lab notebook that they don't know about.

> MR. BURGAN: That's right. I know in just picking up some of the
> laboratory notebooks and leafing through them, you see photographs of
> grains and something that looks like a thickness…Is that a production or
> research emulsion? I haven't studied back through the notebooks to know.

Tr. At 283-284. This dialogue indicates that Agfa is unsure whether or not they have

produced documents that contain an answer to Kodak's interrogatory. Agfa asserts that

production testing will be found in the notebooks, without confidence in this assertion. In

fact, Agfa admits they are unable to determine, from a quick inspection, whether or not a

notebook entry refers to a production or research emulsion, nor do they explain how one

might make the distinction.

When a party is served with an interrogatory, "[i]f the answers lie in the records

of the defendants, they should say so; and, if, on the other side, they do not, they should

say that." *In re Master Key Antitrust Litig.*, 53 F.R.D. 87, 90 (D. Conn. 1971) (citing J.J.

Delaney carpet co. v. Forrest Mills, Inc., 34 F.R.D. 152, 153 (S.D.N.Y. 1963)). Rule

33(d) allows a responding party to answer an interrogatory by producing documents that

"may" contain the answer. However, in the context of Rule 33(d), "may" is not used in

its traditional sense. *Id.* at 89 ("more than a dictionary is required to understand the meaning of 'may' in <u>Rule 33(c)</u>"). "It is not plausible to assume that a response that an answer may (or may not) be found in [a responding party's] records, accompanied by an offer to permit [the requesting party's] inspection is sufficient." *Id.* at 90  Moreover, a requesting party cannot be expected to infer from such an indeterminate response that the responding party does not have an answer. *Id.* "If a party cannot furnish information and details it may so state, under oath." *Id.*

A seemingly blind assertion that the laboratory notebooks contain production emulsions differs little from a statement that the notebooks may, or may not, provide an answer. Agfa, lacking an identifiable reason for their belief, fails to meet the requirements of Rule 33(d). Therefore, Agfa must, at a minimum, confirm that the produced documents contain at least one product emulsion and identify that product emulsion. If Agfa cannot identify a notebook showing a pre-litigation production emulsion, they must state this in their response.

Assuming that Agfa can show that the answer can be found in the produced notebooks, the question remains whether or not Agfa must produce a description of *all* such notebooks. It is unclear for whom such production would be more difficult. Agfa's notebooks contain highly technical information and handwriting that could be better understood by the creators of the notebooks. However, the actual creators of the notebooks are no longer employed by Agfa and it is unclear whether any of their co-

workers who remain are better situated to understand the notebooks.  In addition, Kodak is well versed in the same technology as Agfa.

On balance, I conclude that if Agfa identifies at least one occurrence of a production emulsion in the produced notebooks, it is just as easy for Kodak to go through the remainder of the documents as it would be for Agfa.  Therefore, Agfa has an initial burden to demonstrate that their response answers Kodak's interrogatory by identifying at least one example of production testing in the produced notebooks.  After such a showing, the burden should be placed on Kodak to go through the notebooks and find all such production emulsions.

**F.      Issue Number 15 – Kodak Interrogatory 46**

Kodak Interrogatory 46 requests that Agfa identify, by Bates number, documents relating to analyses, if any, performed by Agfa on emulsions to determine what percentage of total projected area was provided by grains having thickness less than 0.2 microns.  Specifically, Kodak is seeking such documents that were created by Agfa or its predecessors prior to litigation.  Tr. at 210.  The following exchange helps explains the parties' positions:

> MR. CALIHAN:  Are there any documents regarding any analyses which use .2?  Basically it's another way of asking did you look at this for .2.
>
> MR. BURGAN:  But that's a different question. Rather, did I print out the screen that shows .2?
>
> MR. ORMAN:  No.  Documents we're talking about.
>
> MR. CALIHAN:  Documents.  What we're trying to get at is documentary evidence that would reflect and from which we can argue that you did or did not look at it.

MR. BURGAN:   And what we've told you is you can find those documents just as easily as we can.

MR. SIGMOND:   I think what you're saying, Jeff, is that there might be documents -- and I don't know the science that well -- where you've produced -- you may have produced documents that you can look at and somehow someday someone's going to figure out, oh, yeah, they did whatever's being done on the sheet of paper at .2.   But you don't know what they all are right now; is that right?

MR. BURGAN:   Well, I think it's two things.   No. 1, they may have done something that we just don't have.   No. 2, part of the position is that if you see what the average thickness is and you counted all the grains less than .3, they in their minds were making an assessments of the .2 patents at the same time knowing the Bell Curve of the grain distribution.

MR. ORMAN:   Yeah.   But that's simply your best spin or your way of explaining why they never did it by setting the parameter at .2.

MR. BURGAN:   We haven't said they never did it.

MR. ORMAN:   Well, we just want confirmation.   Or if there are other documents, we want them identified because we haven't –

MR. CALIHAN:   Or we want -- what this interrogatory is saying is do you have any documents that reflect this being done at .2.

MR. BURGAN:   And what we have said is you can look for those just as easily as we can.

Tr. At 211-213.

Agfa is basically pointing to a volume of material in which they claim the answer could be found.   After searching through the documents, Kodak claims the produced documents do not contain any pre-litigation documents having 0.2 microns as a search parameter.   Kodak believes that no such documents exist, and simply has requested that Agfa supplement its response to indicate as much.   Tr. at 209.   Agfa has not supplemented and argues that the answer is in the documents produced because some of these documents have parameters that are "just as good as having a .2 cutoff."   Tr. at 208.

However, Agfa's counsel seems to admit that he has not seen documents having exactly 0.2 as a parameter.  *Id.*  Referring to pre-litigation documents, Agfa's counsel stated:  "I don't think I've ever seen one where the grains less than .2 got the 50 percent because the grains are grouped around .24".  *Id.*

In the end, Agfa should answer the interrogatory.  If Agfa has documents that specifically show tests run with 0.2 microns as a parameter, they should identify them as requested.  If they do not have such documents, they must so indicate in their answer. While it may be Agfa's position that values other than .2 are "just as good" as .2, Kodak asks a very simple question – are there documents specifically with .2?  If Agfa is concerned about limiting their argument at trial, they should appropriately qualify their response.  In any event, Agfa should provide a more specific answer.

### G.    Issue Number 16 – Kodak Interrogatory 47

Kodak Interrogatory 47 requests that Agfa identify, by Bates number, the documents supporting entries in Agfa Exhibit 19.  If no such documents are produced, Kodak requests that Agfa should be barred from using Exhibit 19 at trial.  Agfa Exhibit 19 is a chart identifying the time periods during which Agfa's products contained various combinations of emulsions.  The chart was created by Agfa's witness, Marc Van den Zegel for use in a deposition.  Agfa responded to Kodak's Interrogatory 47 by producing various documents, and subsequently supplemented its response with additional documents.   Agfa admits there is no specific record of the documents used to create the chart but maintains that comprehensive support is included in the produced documents. Tr. at 228-229.

In short, Kodak argues that Agfa has not produced documents that provide an adequate foundation for Exhibit 19. Tr. at 230. Kodak's counsel stated:

> I think the question is that there's no foundation for this document if you can't tie it to what it was based on. If they don't support it, and that seems to be their position, they can no longer support entries on that document, then there should be a preclusion of it.

*Id.*

Agfa is basically saying that is has provided all of the information that is has:

> MR. BURGAN:   I think we've given them in the supplementation everything that we can identify that was looked at to recreate it. I think to the extent the interrogatory is seeking something, what did the attorneys say you should look at, I don't know that it does that. But I think the question raises work product. But I don't think we've had to disclose any work product in how we supplemented it. And I don't page think -- I don't know that we can do anything more than what we did because you're sitting there trying to look up different things. You look at manufacturing records. You look at product specifications. Because there's about nine, eight products, maybe 12, 14 emulsions, I forget, it doesn't matter exactly, over a period from '96 to 2002. You're looking at a lot of different things. And we tried to do what we could do when we did the supplementation. I guess there is no one at Agfa that I know of, "I looked at these exact five documents and that's all I did."

Tr. at 228-229.

Exhibit 19 was basically created to help a witness answer some deposition questions. Agfa has attempted to provide Kodak with the sources used to come up with that information. I find that Agfa's response to this discovery is adequate and Agfa should not be compelled to provide any further information. However, whether Exhibit 19 is admissible as evidence is an issue for a later time. Because I have not been asked by the Court to provide a recommendation on such issues, I am providing no opinion one way or the other as to the exhibit's admissibility. That is a question for another day.

**H.      Issue Number 21 – Rule 30(b)(6) Witness on Emails**

Kodak has indicated that Agfa was going to produce a witness on this issue. It is unclear whether this issue is resolved or not. By now, it is assumed that a witness has been provided. If not, the parties should notify me or the Court.

**I.      Issue Number 22 – Rule 30(b)(6) Witness Regarding Dyes**

Kodak has requested a 30(b)(6) witness or a document showing, in Agfa's view, information about various dyes used in the accused products. Tr. at 299-304. At the September 20, 2005 conference, Kodak had not yet considered Agfa's supplement to its response. During the last conference, Kodak's counsel was going to review the written supplementation prepared by Agfa and determine if it was sufficient.

Apparently, Kodak has now determined that the information provided is not sufficient. However, I have not been informed why this information is not sufficient. Without further information, it is difficult to determine if the information is sufficient or not. Therefore, I request that the parties provide me with more information on this topic.

**J.      Issue Number 24 – Lanclus Testimony**

In response to a Rule 30(b)(6) deposition notice relating to the issue of willful infringement, Agfa produced Patrick Theunis as a witness. During his deposition. Mr. Theunis testified that Agfa may rely on work performed by Albert Lanclus, a retired member of Agfa's patent department. Kodak argues that Mr. Theunis was not able to testify fully about all aspects of Mr. Lanclus's work.

Kodak noticed Mr. Lanclus for a deposition but Agfa did not produce him. Apparently Mr. Lanclus is a resident of Belgium. Agfa's position is that since Mr. Lanclus is a retired employee, Agfa cannot compel him to travel to the United States for a

deposition.   Agfa also points out that Mr. Lanclus has a heart condition.   Kodak states

that Belgium is not a signatory to the Hague Evidence Convention.

Nevertheless, Kodak requests that Agfa produce Mr.  Lanclus for a deposition, or

alternatively, provide a witness who has consulted with Mr. Lanclus about the substance

of his work and obtained all information about Mr. Lanclus's opinions.   Tr. at 312.   If

Agfa does not produce a witness for a deposition on Mr. Lanclus's testimony, Kodak asks

that the Court preclude Agfa from relying on Mr. Lanclus's work/opinions at trial.   *Id.*

Agfa continues to say that Mr. Lanclus is elderly and has a heart condition and is

therefore unwilling and/or unable to sit for a deposition.   At the conference, Agfa

indicated that it would not call Mr. Lanclus as a witness at trial:

> SPECIAL MASTER SIGMOND:  But at trial, what are you going to do --
>
> MR. BURGAN:  I don't have to disclose my trial strategy to them for this.
>
> SPECIAL MASTER SIGMOND:  I'm asking so I can try to figure out the unfairness or not of you not doing more than you're already doing.  You don't have to tell me.
>
> MR. BURGAN:  I'm not willing to reveal trial strategies for one.  We're six months or a year away from trial.  I don't know for sure what we're going to do other than we have no expectation of calling Mr. Lanclus because we would have no expectation he would come.  He's 70-something years old and has a heart problem.
>
> SPECIAL MASTER SIGMOND:  I can tell you one thing, I do feel like you're representing right now that you're not going to call Lanclus.
>
> MR. BURGAN:  That's certainly true.

Tr. at 314.

As an initial matter, it appears that Mr. Lanclus cannot be compelled to take a

deposition if he does not wish to do so.   Therefore, Kodak's request cannot be granted in

so much as they ask that Mr. Lanclus himself be produced.  However, at the hearing, I

made several suggestions as to how Agfa should attempt to resolve this issue. I thought

Agfa had agreed to my suggestions:

> SPECIAL MASTER SIGMOND: And this guy won't even agree to be deposed on the phone?

> MR. BURGAN: He said he was not -- would not be willing to do anything. If they want a letter from his doctor saying no, he can't do it, he said he would get that. So if you want that --

> SPECIAL MASTER SIGMOND: So his doctor would say he can't do it?

> MR. BURGAN: That's what I've been told.

> MR. ORMAN: Recognize, we offered to go over there.

> *   *   *   *

> SPECIAL MASTER SIGMOND: How about this. Last time there was a misunderstanding over whether or not -- you say with this other witness that once you got to talk to him, he said, "Oh, no, I would have volunteered." So could we ask Mr. Lanclus --

> MR. BURGAN: We've done that because this all came out after the problem with the other witness. We went back –

> SPECIAL MASTER SIGMOND: How about this. Could you ask him to sign a declaration in his native tongue that says he's unwilling to sit for a deposition, two or three-liner?

> MR. BURGAN: Sure. Yes.

> SPECIAL MASTER SIGMOND: And then get a note from his doctor saying he can't sit for a deposition. And then I don't know. If they have a declaration from a guy, Mike, it's a little bit rough to –

> MR. ROCHFORD: Then the question becomes, is it reasonable given that it really is information within the possession of Agfa to have Theunis or whoever the appropriate designee would be to talk to Lanclus and have that information and be subject again to a limited further deposition that would provide us with that information.

> SPECIAL MASTER SIGMOND: That's a good point. Is he willing to talk to these people?

MR. BURGAN:  My understanding is in the discussions, they have called and talked to him several times.  He says he doesn't remember anything.

MR. ORMAN:  Have they shown him his documents?

MR. BURGAN:  I don't know what he did.  I know he said, "I've got a heart problem.  I'm not willing to get involved in this case."  If you want us to go back and ask him will he talk to them, we can ask.  But I can't make him do that.

SPECIAL MASTER SIGMOND:  Why don't you ask.  I understand.  If you think something would help in his declaration -- maybe we shouldn't even make the guy do a declaration.  He could write a letter.  I don't know.  There's some countries where you're not allowed to –

MR. BURGAN:  It's touchy.  That was one of the issues with the e-mail.  We couldn't just go search for e-mail because it's against the law.

SPECIAL MASTER SIGMOND:  Yes.  I found that interesting.

MR. ORMAN:  You just needed to get their consent, right?

MR. BURGAN:  Yes.

SPECIAL MASTER SIGMOND:  We're past that issue.  Why don't you see if he'll talk to these guys, his old friends, his old co-employees, get him a declaration that says if he will or will not testify.  Look, Jeff, I trust you and your co-counsel.  I mean, I'm just saying, it better be his free will that he says, "I will not do it."

MR. BURGAN:  I understand.

SPECIAL MASTER SIGMOND:  If he says, "You know what, if it will really help, I'll do it for an hour a day, a week apart."  All I can ask you to do is just honestly go and figure out what the guy would do and tell us what he won't do.  I think that's fair.  And if there's a doctor's note involved, that's fine, too. And then we'll know what we're up against.

Tr. at 316-319.

It appears from the subsequent correspondence that has been provided to me that Agfa has confirmed that Mr. Lanclus will not agree to participate and that his doctor is in agreement.  Letter from Rochford to Sigmond of 2/7/2006 at Tab F.  Agfa states that

"Patrick Theunis again asked Mr. Lanclus about his availability for a deposition." *Id.* at Tab F.  However, it is unclear whether Mr. Theunis has asked Mr. Lanclus about the substance of his prior work.[5]  If it hasn't happened already, and assuming Mr. Lanclus's health permits, Agfa should attempt to have Mr. Theunis (or someone else who knows Mr. Lanclus) speak to Mr. Lanclus about his previous work, as suggested.  If such inquiry uncovers further information, Agfa should provide a witness for deposition on the additional information.

Finally, the question becomes what should happen if Agfa provides no further information about the work that Mr. Lanclus performed that Agfa intends to rely on as a defense to willfulness.  As I told the parties during the conference, this seems to be more of an evidentiary issue than a discovery issue.  Kodak continues to ask for an order precluding the use of the Lanclus materials unless further discovery is provided. However, Agfa has provided the 30(b)(6) witness (Mr. Theunis) that it apparently thought was the most knowledgeable about the subject matter.  In addition, Kodak has taken the deposition of at least one other witness with some knowledge in this area, Mr. Steeman.  If Agfa has provided all of its "corporate knowledge" on this issue, then Agfa has fulfilled its discovery obligations.  However, at trial, it would be unfair for Agfa to suddenly produce additional facts not provided during discovery.  Therefore, if there are other facts that Agfa will rely on at trial relating to this topic, Agfa should provide a

---

[5] In his letter to Kodak's counsel, Agfa's counsel states that "Mr. Lanclus declined to discuss this matter any further because of his quite severe heart rhythm problems." *Id.* Did he decline to discuss it further with anyone at all including, for example, Mr. Theunis?  It is just not clear from the record.

corporate witness for deposition as soon as possible.   Otherwise, Agfa should not be allowed to use any information not provided to Kodak during discovery.[6]

## III.   CONCLUSION

As detailed above, Agfa should produce the additional material indicated.

Dated:  April 21, 2006                    Respectfully Submitted,

Special Master

          /s/ Leif R. Sigmond, Jr.
Leif R. Sigmond, Jr.
McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive, 32nd Floor
Chicago, IL  60606
Phone:  312 913 0001
Facsimile:  312 913 0002
Email:  sigmond@mbhb.com

---

[6] To be clear, I recognize that one of Agfa's experts may have something to add by way of expert opinion on Mr. Lanclus's work.  I am not suggesting that discovery of any such opinion must occur now.  That discovery should occur during the time expert reports are provided and expert depositions are taken.